UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HORACE CRUMP, #236528,

                        Plaintiff,                      Civil Case No. 10-13787

v.                                              Hon. Gerald E. Rosen
                                              Magistrate Judge David R. Grand

AMY BEST, *et al.*,

                        Defendants.

_____/

## REPORT AND RECOMMENDATION
### on
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [18]

Before the Court is a Motion for Summary Judgment [18] filed by all Defendants other than Defendant Terry Beard, who was never served. The motion has been referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment [21] be **GRANTED. IT IS FURTHER RECOMMENDED** that all Defendants other than Defendant Beard[1] be **DISMISSED** from this action with prejudice as to Plaintiff's federal claims, and without prejudice as to Plaintiff's state law claims.

## I.    INTRODUCTION

### A.    FACTUAL BACKGROUND

On September 23, 2010, Mr. Horace Crump ("Plaintiff") commenced this action by filing a *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the First and Eighth Amendments of the United States Constitution. He also alleged a

---

[1] The court will issue a separate Report and Recommendation addressing Beard's status.

violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §

2000cc–1, as well as various state law causes of action.  His allegations all relate to his

experiences as a prisoner at the Michigan Department of Corrections' ("MDOC") Saginaw

Correctional Facility ("SRF") in Freeland, Michigan.  All of the named defendants

("Defendants") are employees at the SRF: Warden Lloyd Rapelje, Resident Unit Manager

("RUM") James Zummer, Grievance Coordinator Russell Vittitow, Hearings Investigator Scott

Freed, Assistant Resident Unit Supervisors ("ARUS") Amy Best and Kelly Buczek, General

Office Assistant RaeAnn Blakeley, Librarian Ervin Bell, and Resident Unit Officers ("RUOs")

Shane Allen and Terry Beard.  The docket shows that Defendant Beard has not been served.

### i.   Defendant Best – roommate and cell transfer requests

Plaintiff was transferred to the SRF on April 10, 2009.  *See* Compl. [1] at ¶ 1.  Almost

immediately, he had difficulty coexisting with his cellmate.  *Id*. at ¶¶ 2-3.  He initiated the SRF's

room-move procedure and approached Defendant Best, the ARUS for his unit, to assist him with

his request.  *Id*. at ¶¶ 4-7.  Best did not approve a move for Plaintiff, so he raised the issue with

Warden Rapelje by letter.  *Id*. at ¶ 11, Ex. A.  Rapelje forwarded the letter to Best, who in turn

allegedly called Plaintiff into her office, then berated him for sending it.  *Id*. at ¶¶ 12-15.

Plaintiff informed Best that he would be filing a grievance related to her conduct.  *Id*. at ¶ 16.

Plaintiff alleges that shortly thereafter, he was handcuffed and taken to segregation.  Compl. [1]

at ¶ 17.  Apparently, Best had written Plaintiff up on three charges of major misconduct related

to comments he allegedly made to her in her office and his refusal to leave when she ordered him

to: Threatening Behavior, Disobeying a Direct Order, and Insolence.  *Id*. at ¶ 18; Ex. B.

2

### ii.     Defendant Freed – hearing investigation

Plaintiff pled not guilty to the charges and requested an administrative hearing, claiming that the charges were brought in retaliation for his letter to Warden Rapelje.  Compl. [1] at ¶ 18. Defendant Freed was assigned as Plaintiff's Hearing Investigator.  *Id*. at ¶¶ 23-28, Ex. B. Plaintiff alleges that Freed was not helpful to his defense and that he tried to convince Plaintiff to plead guilty to the charges in exchange for a lesser punishment.  *Id*. at ¶¶ 24-28.

The hearing was held on May 26, 2009, and Plaintiff was found guilty of the charges of Insolence and Disobeying a Direct Order, resulting in a disposition of ten days of detention and ten days of loss of privileges.  *Id*. at ¶ 27, Ex. B (Agency Record).  The Threatening Behavior charge, which could have resulted in continued administrative segregation, was dismissed.  *Id*.

### iii.     Defendant Zummer – access to legal materials during segregation

While in segregation and prior to the administrative hearing, Plaintiff received correspondence from an attorney.  *Id*. at ¶ 29, Ex. D.  Plaintiff informed the RUM, Defendant Zummer, that he wanted access to his legal property and that he needed to send out legal mail to the attorney regarding an appeal of his criminal conviction.  *Id*. at ¶ 30.  Plaintiff alleges that Zummer "told him that if he was so concerned with his litigation and legal mail, he should not have committed the pending misconducts and stayed out of segregation."  *Id*.  After several days, on May 22, 2009, another RUO took Plaintiff's outgoing legal mail, which included Plaintiff's draft appellate brief, and told him that it would be mailed.  *Id*. at ¶ 31-32.  About two months later, when Plaintiff next contacted the attorney, the attorney replied by letter dated August 3, 2009 that he had not received the copy of Plaintiff's brief, but also that he had not been doing any legal work for the preceding month because his wife had been injured and needed constant care.  *Id*. at ¶ 33, Ex. E.  On August 31, 2009, Plaintiff filed a grievance protesting the staff's

3

alleged failure to send out his legal mail.  *Id*. at Ex. F (Grievance SRF-2009-08-1163-15F).  He ultimately filed his state-court appellate brief and a civil complaint in the Western District of Michigan without the assistance or approval of the attorney.  *Id.* at ¶ 45.  Zummer denies that Plaintiff ever requested access to his legal materials, and denies making the statement Plaintiff attributes to him.  Defs.' Mot. S.J. [18] at 3, Ex. B (Zummer Affidavit) at ¶¶ 4-5.

Also while Plaintiff was in segregation, on May 29, 2009, Zummer reviewed his security classification, and determined that he should be designated as Level 4.  Compl. [1] at ¶ 46.  However, Zummer's determination erroneously included points for the Threatening Behavior misconduct charge that was dismissed.  *Id*. at ¶ 47.  On June 6, 2009, Plaintiff filed a grievance alleging that the miscalculation was intentionally made to raise his security level in retaliation for his request to be moved, and that as a result of his Level 4 designation, his personal property had been seized.  *Id*. at ¶ 47, Ex. O (Grievance SRF-2009-07-0769-28B).  On June 23, 2009, Plaintiff's security classification was reevaluated, but remained the same even without the points that had been erroneously added.  *Id.*, Ex. P (Security Classification Screen, 6/23/2009).

### iv.   Defendants Beard and Allen – microwave use during Ramadan

Next, Plaintiff names RUOs Beard and Allen in a series of allegations related to his observance of Ramadan for eight days around late August 2009.  *Id*. at ¶¶ 49-76.  Plaintiff's allegations relate principally to issues with heating his meals during the holiday.  He alleges that between August 22 and 24, 2009, Defendants Beard and Allen refused to let him use the microwaves or get hot water to heat his Ramadan meal bags that arrived frozen or his other canteen-purchased food that required heating.  *Id.* at ¶¶ 56-58.  Plaintiff informed the Warden, and for the next two days he claimed there were no incidents related to his use of the microwave.  *Id.* at ¶¶60, 63.  For the next four days, Plaintiff alleges that he was allowed to use a microwave

4

to heat his Ramadan meal bag, but that he had to do so at a fixed time of day which was one hour
before he could eat the food under the rules of the Ramadan holiday, making it cold when he was
ready to eat.  *Id.* at ¶66.  He also claims he was not allowed to use the microwave to heat his
canteen food during that period.  *Id.*  Plaintiff allegedly experienced various stomach problems as
a result of eating the uncooked or cold food.  *Id.* at ¶¶ 57, 59.  On August 29, 2009, Plaintiff filed
a grievance related to these issues.  *Id.* at Ex. X (Grievance SRF-2009-09-1217-28K).

### v.       Defendants Blakeley, Buczek and Allen – handling of prison mail

Next, Plaintiff alleges that his outgoing mail was mishandled by prison staff and
Mailroom Supervisor ReaAnn Blakeley.  *Id.* at ¶¶ 73-80.  On December 30, 2009, Plaintiff
received a Disbursement Authorization notifying him that four pieces of outgoing personal mail
had not been processed because Plaintiff's prisoner account had insufficient funds to cover the
postage; the notice also stated that one outgoing letter had been sent to the MDOC Director's
office.  *Id.* at ¶ 74, Ex. Z.  On January 4, 2010, Plaintiff filed a grievance claiming that his mail
was rejected in retaliation for his lawsuit and "request for restraining order," that he had been
denied the ability to write to his family at Christmas, and that his unmailed letters were not
returned to him.  *Id.* at ¶¶ 74-78, Ex. AA (Grievance SRF-2010-01-0007-15B).  During the
grievance interview, Plaintiff was told that his unmailed letters were given to Defendant Allen to
return to Plaintiff.  *Id.* at ¶ 75.  The grievance was denied at Steps I, II and III, noting:

> [Plaintiff] is allotted $4.40 in postage when he is on indigent status.  The
> allotment is used for both legal and personal correspondences.  If the entire
> allotment is used, additional funds will be loaned for mail which is legal but
> not for personal correspondence.  [Plaintiff] mailed letters to his family when
> the indigent funds were no longer available.  No relief is warranted.

*Id.*, Ex. AA.

Plaintiff then filed another grievance against Defendants Allen, Blakeley, and Buczek, alleging that they failed to return his unmailed letters in retaliation for his lawsuit. *Id*. at ¶ 75, Ex. BB (Grievance SRF-2010-02-0228-15F). At Step I, that grievance was largely denied as duplicative of the previous grievance. *Id*. However, the investigation revealed that "the issue of the four pieces of mail not being returned to the grievant was not addressed in grievance SRF-2010-01-0007-15B." *Id*. at Ex. BB. It was determined that:

> The four envelopes that were marked NSF were placed in the mailbox of ARUS Buczek by R. Blakeley on or about 12-28-09 for distribution. The next day ARUS Buczek gave them to RUO Allen as he was the unit officer and passing out mail is an assigned duty. RUO Allen indicates that he called the grievant out the same night and provided the four envelopes to the grievant. RUO Allen indicates the envelopes were still bundled together with a rubber band. The grievant provides no verifiable evidence to support his allegation that mail in question was not given back to him. Based on the available information and testimony, I find no violation of policy or an act of retaliation.

*Id*. Plaintiff's Step II appeal was denied as untimely because he did not mail it until one week after it was due; it was also "noted for the record that the Step I response adequately addressed the issue grieved." *Id*. Plaintiff's Step III appeal was denied, as well. *Id*.

### vi.   Defendant Buczek – prison transfer process

On December 30, 2009, the day Plaintiff had completed six months in close security, Defendant Buczek completed a "transfer screen" to determine his placement on a list of inmates awaiting bed space for reentry into the medium security portion of SCF. *Id*. at ¶ 84 & n.16. On January 14, 2010, Plaintiff was transferred to the Michigan Training Unit ("MTU"). *Id*. at ¶ 89. He complains that upon transfer, he had to choose only the personal property that would fit in his duffel bag, and was forced to leave behind legal property and religious books that were contained in his footlocker. *Id*. at ¶¶ 85-86. Plaintiff complains that he should not have been transferred to

MTU, that in the process he lost the tutoring job that was his only source of income, and that Buczek transferred him in retaliation for his dispute with Best.  *Id.* at ¶¶ 81, 90-91, Ex. CC.

### vii.    Defendant Bell – access to law library and supplies

Next, Plaintiff alleges that MDOC Librarian Ervin Bell refused to: (1) make sufficient copies of his legal filings, (2) grant him additional time in the prison law library, and (3) provide him with "adequate supplies needed for litigation" in the form of typing paper and envelopes.  *Id.* at ¶¶ 92-102.  Plaintiff claims that Bell's refusal to provide supplies was in retaliation for Plaintiff's complaints and grievances against him, and because Plaintiff had filed a lawsuit against his coworkers and superiors.  *Id.* at ¶ 103.

### viii.    Defendants Vittitow and Rapelje – denial of grievances

Plaintiff alleges that MDOC's Grievance Coordinator, Defendant Russell Vittitow, retaliated against him by rejecting or denying every grievance he filed that is relevant to this matter.  *Id.* at ¶¶ 105-130.  Finally, Plaintiff complains that Warden Rapelje did not respond to his "confidential correspondence," refused to answer his written questions, "repeatedly refused to intervene on Plaintiff's behalf," failed to order appropriate investigations into his complaints, and justified Vittitow's and others' responses to his grievances, all in retaliation and in furtherance of an alleged "conspiracy."  *Id.* at 131-40.

### B.    PROCEDURAL HISTORY

On March 8, 2011, Defendants filed a Motion for Summary Judgment as to Plaintiff's federal claims [18].  On November 2, 2011, Plaintiff filed a Response [27].

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In determining whether a genuine issue of material fact exists, the court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In response to a summary judgment motion, the opposing party may not rest on its pleadings nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id.* (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Conclusory statements unadorned with supporting

facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 560

(citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

**III.    ANALYSIS**

    **A.    Exhaustion Standards Under the PLRA, 42 U.S.C. §1997e(a)**

    Under the Prison Litigation Reform Act ("PLRA"), a prisoner may not bring an action,

"under [§ 1983] or any other Federal law," to challenge his or her conditions of confinement

until all available administrative remedies have been exhausted.  42 U.S.C. § 1997e(a);

*Woodford v. Ngo*, 548 U.S. 81, 85 (2006).  This "exhaustion" requirement serves two main

purposes: it promotes efficiency by encouraging the resolution of claims at the agency level

before litigation is commenced, and it protects administrative authority by allowing the agency

an opportunity to correct its own mistakes before being haled into federal court.  *Woodford*, 548

U.S. at 89.  § 1997e(a) has been interpreted as requiring "proper exhaustion," meaning that the

prisoner must "compl[y] with an agency's deadlines and other critical procedural rules because

no adjudicative system can function effectively without imposing some orderly structure on the

course of its proceedings."  *Id.* at 90-91; *see also Jones*, 549 U.S. at 217-18 ("proper exhaustion"

requires prisoners to meet deadlines set by the applicable grievance policy).  Thus, untimely

grievances, or ones that otherwise fail to adhere to the agency's procedural rules, cannot form the

basis of a § 1983 action.  *Woodford*, 548 U.S. at 90-91, 95-97 (failure to enforce deadlines

"would permit a prisoner to bypass deliberately and flagrantly administrative review without any

risk of sanction"); *Jones*, 549 U.S. at 217-18.

    "The level of detail necessary in a grievance to comply with the grievance procedures

will vary from system to system and claim to claim, but it is the prison's requirements, and not

the PLRA, that define the boundaries of proper exhaustion."  *Jones v. Bock*, 549 U.S. 199, 218

(2007).  In Michigan's correctional facilities, prisoner grievances are governed by MDOC Policy Directive 03.02.130, "Prisoner/Parolee Grievances."  *See* Defs.' Mot. S.J. [18] at Ex. C (the "Policy").  State prisoners must first complete the process outlined in the Policy before the challenged conduct can be brought as a lawsuit.  *Id.* ¶B.  Two substantive elements of the Policy are in issue in this case: (1) its prohibition against "identical grievances" filed as a form of organized protest, and (2) its strict filing deadlines at each step of the grievance process. Regarding the first, the Policy expressly provides that "[t]wo or more prisoners and/or parolees may not … submit identical individual grievances regarding a given issue as an organized protest." *Id.* at ¶ F.  The grievance process deadlines are more involved, but for purposes of this motion, they can be summarized as follows: If a prisoner cannot resolve his dispute with the involved staff member, he has five business days to file a Step I grievance.  *Id*. at ¶¶ P, V.  If the prisoner is dissatisfied with the Step I response, he may obtain and submit a Grievance Appeal form (CSJ-247B) to the Step II Grievance Coordinator within ten business days after receipt of the Step I response, or if no timely response was received, within ten days of the date the response was due.  *Id*. at ¶ BB.  If the grievant is dissatisfied with, or does not receive, a Step II response, he has ten business days within which to file a final appeal at Step III.  *Id*. at ¶ FF.

Failure to exhaust is as an affirmative defense that must be raised by a defendant, and on which the defendant bears the burden of proof.  *Jones*, 549 U.S. at 216; *Vandiver v. Correctional Medical Services, Inc.*, 326 Fed. Appx. 885, 888 (6th Cir.2009).  As moving parties with the burden of proof, Defendants face a "substantially higher hurdle."  *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001); *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).  The Sixth Circuit repeatedly has emphasized that the party with the burden of proof "must show the record contains evidence

10

satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561.

Defendants identify eleven of Plaintiff's pre-complaint grievances that he took (properly or not) through Step III of the grievance process. Defs.' Mot. S.J. [18] at 10-14, Ex. D. Of those, Defendants identify five that they claim were not properly exhausted, two that are irrelevant to their motion[2], and four properly-exhausted ones that they claim fail on the merits. In addition, to the extent Plaintiff's complaint raises claims based on matters for which he either did not file a grievance or did not exhaust the grievance process through Step III (*i.e.*, claims not part of the eleven identified grievances), Defendants essentially make a failure to exhaust argument. The court will analyze the issues in turn.

**B.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED WITH RESPECT TO GRIEVANCES PLAINTIFF ALLEGEDLY FAILED TO EXHAUST**

**i.    Grievance SRF-2009-09-1217-28k (Microwave Use During Ramadan)**

On August 29, 2009, Plaintiff filed Grievance SRF-2009-09-1217-28k, complaining primarily about his access to microwave ovens to heat his Ramadan meals and store-bought food over the preceding eight days (two days of which he experienced no issues). *Supra*, pp. 5-6; Defs.' Mot. S.J. [18] at Ex. N. On September 9, 2009, the grievance was denied on the grounds that it violated MDOC's Policy against multiple prisoners submitting "identical individual grievances regarding a given issue as a form of organized protest. Such grievances shall be rejected…" *Id.* at Ex. C ¶ F, Ex. N. The Respondent found that "[s]ix grievances were authored on the same day about the same alleged incident and issue. The grievances were obviously

---

[2] Defendants are correct about the irrelevancy of Grievance Nos. SRF-2009-11-1617-17a and SRF-2009-10-1526-28k. The former relates to an alleged assault on Plaintiff by Defendant Beard. Defendants correctly note that the grievance "is irrelevant for purposes of [their] motion" because, as noted above, Beard had not been served when they filed the motion. Defs.' Mot. S.J. [18] at 11. Similarly, the Defendants are correct that the subject matter of the latter grievance (Ex. NN to Plaintiff's complaint) "does not pertain to the allegations in the instant Complaint." *Id.* at 12. Plaintiff cites that grievance only to show the response he received from Defendant Vittitow, which response Plaintiff claims was "retaliatory." Compl. [1] at ¶ 127.

authored by the same individual as the wording and typewriter font are the same.  These grievances were utilized as a protest in violation of policy and procedure." *Id.* at Ex. N.  The Respondent further noted that the microwave issue was addressed by prison staff after the grievances were filed.  *Id.*  Plaintiff's Step II and Step III appeals simply reiterated his initial grievance complaint.  *Id.*  The Respondents denied those appeals and reiterated the initial Respondent's position as to the grievance's procedural defect and its merits.  *Id.*

Defendants did not meet their burden of proof as to the grievance's procedural propriety. Plaintiff's underlying grievance contained numerous allegations that appear to be personal to him.  *See* Defs. Mot. S.J. [18] at Ex. N, p. 5 (*e.g.*, "I prepared a Ramadan proposal"; describing how Plaintiff's individual medical conditions were allegedly affected by the challenged conduct, and describing conversations he allegedly had with certain of the Defendants).  Plaintiff admitted helping others write grievances related to the issue, but contends that they were not "identical" to his in material respects.  Pl.'s Resp. [27] at 2.  Defendants did not provide the court with copies of the other grievances which they contend are "identical" to Plaintiff's.  Thus, the court has no way to assess whether the rejection of Plaintiff's grievance under Paragraph F of the Policy was proper, which precludes the court from granting summary judgment on Defendants' failure to exhaust argument.  *Arnett*, 281 F.3d at 561.

However, the court finds that summary judgment in Defendants' favor is nevertheless appropriate, whether Plaintiff's related claim is construed as being made under the Eighth Amendment (prohibiting cruel and unusual punishment) or the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc–1 ("RLUIPA") (prohibiting "substantial burden on the religious exercise" by prisoners).  Plaintiff complains, at most, about six (out of eight) dinners in which he allegedly had to eat cold or uncooked food.  Even if

12

Plaintiff could not eat a daytime meal those days due to the Ramadan holiday, Plaintiff does not claim he was denied early breakfasts on those dates, or that the breakfasts alone were not sufficient to sustain him.  While the Eighth Amendment requires "prison officials [to] ensure that inmates receive adequate food, clothing, shelter, and medical care," *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Sixth Circuit has made clear that even an occasional missed meal does not rise to the level of a constitutional deprivation, so long as the daily meal or meals provided are sufficient to maintain normal health.  *See, e.g.*, *Cunningham v. Jones*, 667 F.2d 565 (6th Cir. 1982) (prisoner's Eighth Amendment rights were not violated when he was served only one meal a day for fifteen consecutive days, where the one meal furnished was sufficient to maintain normal health).  *See also Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir.1987) ("Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."); *accord Stapleton v. Wilson*, No. 07-cv-218-KSF, 2007 WL 3120121, *6 (E.D. Ky. Oct. 23, 2007) ("The law is not favorable to inmates who complain about the quality of the food served to them.") (collecting cases); *LeMaire v. Maass*, 12 F.3d 1444, 1455 (9th Cir. 1993) (food served in prison "need not be tasty or aesthetically pleasing."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir.1985) (even "food [that] occasionally contains foreign objects or is sometimes served cold, while unpleasant, does not amount to a constitutional deprivation.") *accord Smith v. Younger*, No. 98-5482, 1999 WL 623355, at *2 (6th Cir. Aug. 9, 1999).

Similarly, these incidents were not sufficiently serious so as to constitute a "substantial burden" on Plaintiff's ability to observe the Ramadan holiday in violation of the RLUIPA.[3]  *See*

---

[3] Plaintiff also complains that during Ramadan he was not allowed to shower during standard meal times when other prisoners were in the dining hall.  Compl. [1] at ¶ 58.  At best, that describes a minor inconvenience to Plaintiff which clearly does not constitute a "substantial burden" on his overall ability to observe Ramadan.

*Green v. Tudor,* 685 F.Supp.2d 678, 702 (W.D. Mich. 2010) ("Serving prisoners cold meals during Ramadan" did not violate RLUIPA); *Jaami v. Compton*, 182 F.3d 917, at * 1 (6th Cir. 1999) (claim based on allegation "that the defendants served the plaintiffs cold breakfast during the Muslim holiday of Ramadan" was frivolous); *Kwanzaa v. Mee*, 2011 WL 2580396, at *10 (D. N.J. Jun. 28, 2011) (issuing food two hours, and milk 13 hours, before plaintiff could consume it under Ramadan restrictions, resulting in cold/spoiled meals did not rise to a constitutional deprivation or violation of RLUIPA).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim that he was forced to eat cold meals on a few particular dates during Ramadan.

### ii. Grievances SRF-2010-01-6-28b (Access to Legal Supplies), SRF-2010-01-5-14a (Access to Law Library), SRF 2010-02-228-15f (Handling of Prison Mail), and SRF-10-02-227-11b (Failure to Deliver Response to a Prior Grievance)

Defendants argue for summary judgment on four of Plaintiff's grievances that were denied as untimely at Step II, and upheld as such at Step III.  Defs.' Mot. S.J. [18] at 10, 11, 12.

### a. Grievances SRF-2010-01-6-28b and SRF-2010-01-5-14a

On December 31, 2009, Plaintiff filed Grievances SRF-2010-01-6-28b and SRF-2010-01-5-14a[4].  The first complained that Defendant Bell, the MDOC prison librarian, denied him access to sufficient quantities of typing paper, legal envelopes and carbon paper.  *Id.* at Ex. K. The second complained that Bell refused to allow him extra time in the law library, which he needed in light of his four pending court cases.  *Id.* at Ex. J.  The first grievance was denied at Step I for being "vague."  *Id.* at Ex. K.  The second was denied as "vague," and because, although additional library time could be granted to meet a court deadline under MDOC Policy 05.03.115(Q), Plaintiff had not articulated such a specific need, and thus did not allege a

---

[4] This grievance's original identifier ended in "-28B" but was changed at Step III.  *Id.* at Ex. J.

violation of any policy.  In each instance, Plaintiff did not submit his Step II grievance appeal until "nearly 3 weeks after it was due," and because he did not provide an adequate reason for the appeals' tardiness, they were denied as untimely.  *Id.* at Ex. J and K.  At Step III, Plaintiff offered no explanation for his tardy Step II appeal in the first grievance, but with the second grievance, he blamed his tardy Step II appeal on being transferred to a different prison shortly before its due date.  *Id.*, Ex. J, p. 3; Ex. K., p. 3.  Each Step II denial was upheld at Step III.  *Id.*

Defendants' exhaustion argument with respect to these two grievances is well taken.  To properly exhaust the grievances, Plaintiff was required to timely file at each of the successive steps provided for in Policy Directive 03.02.130.  *Woodford*, 548 U.S. at 90-91; *Jones*, 549 U.S. at 217-18.  Defendants showed through the above evidence that Plaintiff failed to do so, and Plaintiff's vague reference to a "transfer," Pl.'s Resp. [27] at 4, lacks merit.  Although Paragraph G(4) of the Policy provides that a grievance "shall not be rejected if there is a valid reason for the delay; e.g., transfer," *see* Defs.' Mot. S.J. [18], Ex. C, ¶G(4), the evidence produced by Defendants showed that Plaintiff possessed the Step II appeal form well prior to his transfer, and that even after his transfer he had five days to timely file the form.  *Id.*, Ex. J, pp. 3-4; Ex. K, pp. 3-4.  Plaintiff did not respond with any evidence that the transfer caused him to miss the deadline at all, let alone by three weeks.  *Wrench LLC*, 256 F.3d at 453.  Accordingly, summary judgment is appropriate as to Grievances SRF-2010-01-6-28b and SRF-2010-01-5-14a.  *Id.*

**b.    Grievances SRF-2010-02-228-15F and SRF-2010-02-227-11b**

On January 19, 2010, Plaintiff filed Grievance SRF-2010-02-228-15F, complaining that four personal envelopes were not mailed out, and that the prison staff's failure to return the envelopes and their contents was an act of retaliation.  *Id.* at Ex. F.  A prior grievance addressed why the four envelopes were not mailed, so the Step I Respondent addressed only the alleged

15

failure to return Plaintiff's mail to him.  *Id*.  Stating that Plaintiff had "provide[d] no verifiable evidence to support his allegation that [the] mail in question was not given back to him," the Respondent found no violation of policy or act of retaliation, and denied the grievance at Step I.  *Id*.  Plaintiff's appeal to Step II was filed one week late, and was denied on that basis, with a notation that the Step I response adequately addressed the issue grieved.  *Id*.  He appealed to Step III, claiming that he was tardy at Step II because he is "indigent and can only send out grievance forms once a month via indigent mail, which falls late sometime [sic], because there is no IA mail to SRF here."  *Id.* at 3.  That appeal was denied because "[n]o reason was provided which would warrant the delay or untimely submission," and the grievance ruling was upheld.  *Id*.

On January 31, 2010, Plaintiff filed Grievance SRF-2010-02-227-11b, complaining that he never received a Step III response to one of his prior grievances until a copy of that response was attached as an exhibit to the opposing party's legal pleadings.  *Id*. at Ex. E.  No policy violation was found at Step I, and Plaintiff's Step II appeal was denied as untimely upon a finding that he had not mailed his appeal until one week after it was due to the Warden's Office.  *Id*.  Plaintiff made the same argument as above – he had been transferred and the prison only allowed him to mail "indigent mail" once a month.  *Id.* at 3.  The denial of the grievance was upheld at Step III.  *Id*.

When arguing in their brief that Plaintiff failed to exhaust these two grievances, Defendants state that: "Crump's Step II appeal was rejected as untimely, which was upheld at Step III, ***as no reason was offered by Crump as to why his late appeal should be accepted***."  Defs.' Mot. S.J. [18] at 10 (emphasis added).  However, that assertion is inaccurate.  As noted above, at Step III, Plaintiff explained that his Step II appeals were tardy because he is "indigent

and can only send out grievance forms once a month via indigent mail, which falls late sometime [sic], because there is no IA mail to SRF here."  *Id.*, Exs. E and F, p. 3; Pl.'s Resp. [27] at p. 2.

If Plaintiff's contentions are true – that due to a prison rule (and perhaps the timing of his transfer from SRF) he was not afforded the ability to timely send his Step II appeals – then he would appear to have "a valid reason for the delay."  *See* Policy, ¶G(4); *see also Brock v. Kenton County, KY*, 93 Fed. Appx. 793 (6th Cir. 2004) (explaining the proposition that "a grievance procedure is not 'available' even if one exists on paper if the defendant prison officials somehow prevent a prisoner from using it").  Despite having a high burden of proof on Plaintiff's alleged failure to exhaust, *Arnett*, 281 F.3d at 561, Defendants did not address his explanation for his tardiness.  Accordingly, the Court cannot find that Crump failed to exhaust Grievance Nos. SRF-2010-02-228-15F and SRF-2010-02-227-11b.  However, a review of the underlying grievances and allegations in Plaintiff's complaint shows that Defendants are entitled to summary judgment on the merits of those claims.

There is no doubt that "[F]irst [A]mendment concerns are implicated when restrictions are imposed upon an inmate's correspondence."  *Martin v. Kelley*, 803 F.2d 236, 240 (6th Cir. 1986); *U.S. v. Holloway*, 740 F.2d 1373, 1382-83 (6th Cir. 1984).  When prisoner communications are *systematically* subjected to restriction by prison officials, the restrictive regulation is analyzed under a reasonableness standard under which it is valid when it is reasonably related to legitimate penological interests.  *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989).  Although, depending on the circumstances, even one instance of mail censorship could amount to a constitutional violation under the First Amendment, *see Martin*, 803 F.2d at 238 n.3, "isolated instances of interference with prisoners' mail" do not necessarily rise to the level of a constitutional violation under the First Amendment.  *See Johnson v. Wilkinson*, 229 F.3d 1152

17

(6th Cir. 2000) (citing *Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997) (holding that an "isolated incident, without any evidence of improper motive or resulting interference with [the inmate's] right to counsel or to access to the courts, does not give rise to a constitutional violation.")); *Colvin v. Caruso*, 605 F.3d 282, 293 (6th Cir. 2010) (citing *Johnson* for the holding that "isolated incidents" of interference with prisoners' rights do not rise to the level of a First Amendment violation).

Here, in Grievance SRF-2010-02-228-15F, Plaintiff complains of prison staff's alleged failure to return to him, on one occasion, four pieces of outgoing personal mail that had been rejected for insufficient postage. This allegation is insufficient to support Plaintiff's charge of systematic interference with his mail. First, the court notes that Plaintiff does not challenge the reason for the mail's rejection – that he lacked insufficient postage to send the letters. Second, he presented no evidence of improper motive by the prison mailroom staff who supposedly failed to return his mail. In short, he has shown, at best, nothing more than one instance of "random and isolated interference with [his] mail," which does not rise to the level of a constitutional violation under the First Amendment. *See Johnson*, 229 F.3d 1152; *Lewis v. Casey*, 518 U.S. 343, 351-54 (1996); *Colvin*, 605 F.3d at 293. Accordingly, Defendants are entitled to summary judgment regarding Plaintiff's claims related to Grievance SRF-2010-02-228-15F.

Similarly, Plaintiff failed to sustain his claim as to Grievance SRF-2010-02-227-11b, in which he complains that he did not receive a Step III response to one of his prior grievances until a copy of that response was attached as an exhibit to an opposing party's legal pleadings. To the extent that a First Amendment claim specifically seeks to allege interference with an inmate's access to the courts, a plaintiff must satisfy constitutional standing requirements by showing that he or she suffered an "actual injury" or legal prejudice because of the actions of the defendants.

*Lewis*, 518 U.S. at 349-51); *see also Okoro v. Scibana*, 63 Fed. Appx. 182, 184 (6th Cir. 2003)

(citing *Lewis*, 518 U.S. 343, 351-54 (1996) (plaintiff's claim failed because there was no

showing that mail interference "resulted in the loss of any non-frivolous legal claim, or that [the]

defendants' conduct [was] preventing him from presenting a non-frivolous legal claim").  Thus,

"not every infringement or inconvenience suffered by [a] litigating prisoner implicates this

constitutional right."  *Thomas v. Rochell*, 47 Fed. Apps. 315, 317 (6th Cir. 2002).

Insofar as Plaintiff claims that the alleged failure to deliver a Step III grievance response

constitutes interference with his access to the courts, he has failed to show that he suffered the

requisite "actual injury" or legal prejudice because of any action by the Defendants.  *See Lewis*,

518 U.S. at 349-51.  He has not alleged that Defendants' alleged mishandling of the referenced

Step III grievance response "resulted in the loss of any non-frivolous legal claim, or that

[D]efendants' conduct is currently preventing him from presenting a non-frivolous legal claim."

*See Okoro*, 63 Fed. Appx. at 184.  Indeed, the fact that the Step III grievance response was

ultimately attached to the opposing party's motion suggests that Plaintiff had an opportunity to

litigate the underlying matter, including whether he was entitled to any equitable tolling as a

result of his delayed receipt of the Step III response.  Because Plaintiff has made no suggestion

that he suffered any actual injury as a result of Defendants' alleged failure to deliver the single

Step III response, Defendants are entitled to summary judgment regarding Plaintiff's claims

related to Grievance SRF-2010-02-227-11b.  *See Lewis*, 518 U.S. at 351-54.

   C.   **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED WITH RESPECT TO GRIEVANCE NOS. SRF-2009-06-769-28b (security classification), SRF-2009-08-1163-15f (processing of legal mail), SRF-2010-01-7-15b (provision of postage) and SRF-2009-06-769-28b (provision of photocopies)**

Defendants acknowledge that Plaintiff properly exhausted his administrative remedies as

to the issues raised in the remaining four Step III Grievances.  Defs.' Mot. S.J. [18] at 11, 12, 13.

In Grievance SRF-2009-06-769-28b, Plaintiff complained that Defendant Zummer improperly classified him as a Level IV inmate, and that his personal property was seized as a result, in violation of his due process rights. *Id*. at Ex. O.  In Grievance SRF-2009-08-1163-15f, Plaintiff complained that Zummer refused to process his legal mail, denying his right of access to the courts. *See id*. at Ex. M.  In Grievance SRF-2010-01-7-15b, Plaintiff stated that Defendant Blakeley denied him funding to pay for postage for his outgoing personal mail, and that this was done in retaliation for his lawsuits against MDOC staff members. *See id*. at Ex. I.  Finally, in Grievance SRF-2009-06-769-28b, Plaintiff alleged that Defendant Bell denied him access to the courts by not providing multiple photocopies of Plaintiff's legal documents. *See id*. at Ex. H. Summary judgment should be granted as to each of these grievances.

### i.        Grievances SRF-2009-08-1163-15f and SRF-2009-06-769-28b

Prisoners enjoy a "fundamental constitutional right of access to the courts [that] requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977).  However, inmates are not guaranteed "the wherewithal to transform themselves into litigation engines." *Lewis*, 518 U.S. at 355; *Coleman v. Gov. of Michigan*, 413 Fed. Appx. 866, 874 (6th Cir. 2011).  Rather, they must be provided, at the least, with "paper and pen to draft legal documents, notary services to authenticate the papers, and stamps to mail them." *Coleman*, 413 Fed. Appx. at 874 (citing *Bounds*, 430 U.S. at 828).  The right to legal assistance is not "abstract" or "freestanding," and there is no generalized "right to litigate" guaranteed by the First Amendment. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999); *Lewis*, 518 U.S. at 351.

Rather, to sustain a claim for interference with access to the courts, an inmate must satisfy constitutional standing requirements by showing that he or she suffered an "actual injury" or legal prejudice due to the actions of the defendants. *Lewis*, 581 U.S. at 349-51. Thus, "not every infringement or inconvenience suffered by the litigating prisoner implicates this constitutional right." *Thomas v. Rochell*, 47 Fed. Apps. 315, 317 (6th Cir. 2002). Here, Defendants argue that Plaintiff cannot demonstrate the requisite "actual injury" to support his claim that he was denied access to the courts. *See* Defs.' Mot. S.J. [18] at 15-16.

### a.  Grievance SRF-2009-08-1163-15f

In Grievance SRF-2009-08-1163-15f Plaintiff alleges that Defendant Zummer refused to process his legal mail while he was in segregation, which amounted to a denial of his right of access to the courts. *Id*. at Ex. M; Compl. [1] at ¶¶ 29-45. Zummer denies that Plaintiff made any requests regarding legal mail. Defs.' Mot. S.J. [18] at 16, Ex. B ¶¶ 4-5. Plaintiff complains that after he sent an appellate brief to an attorney, Mr. Williston, he received no response until two months later when he wrote again to Williston, who stated that he had not received the brief. Compl. [1] at ¶¶32-33, Ex. E (Williston 8/3/09 letter to Plaintiff) (noting that he had not "received a copy of your Appeals Court Brief but [] would like to read it ...").

The court rejects Plaintiff's claims that Zummer's alleged acts caused him to be "unable to file his appeal via counsel." *See* Pl.'s Resp. [27] at 5. First, the record does not establish the capacity in which Mr. Williston may have been advising Plaintiff regarding his appeal. *See* Compl. [1] at Ex. C, pg. 84 of 90 (Williston letter, May 14, 2009) (inquiring as to "who helped [Plaintiff] on [his] latest appeal," and whether Plaintiff had "spoken to [another individual] about it"). Indeed, it was Plaintiff who was sending the brief to Williston, and Plaintiff who was going to file it. *See* Compl. [1] at ¶¶32-33, Ex. E (Williston letter, August 3, 2009) ("Please send me a

copy of your Brief and I'll read it and get it back to you.  Don't lose your time to file in the Supreme Court because if your (sic) late, they'll deny you.").  Second, for similar reasons as those noted above with respect to the missing Step III response, Plaintiff has failed to show any "actual injury" as a result of Zummer's alleged conduct.  Defendants properly note Plaintiff's admission that he ultimately filed his state-court appellate brief and his Western District of Michigan civil complaint without the assistance of Attorney Williston.  *Id.* at 16; ¶45.  And, there is no indication in the record that that brief was untimely filed, or that Plaintiff's legal interests were prejudiced in any respect.[5]  *Lewis*, 518 U.S. at 349-51; *Okoro*, 63 Fed. Appx. at 184.  Having failed to allege or identify any "actual injury," Defendants are entitled to summary judgment as to the claims raised in Grievance SRF-2009-08-1163-15f.

### b.   Grievance SRF-2009-06-769-28b

In Grievance SRF-2009-06-769-28b Plaintiff alleges that Defendant Bell denied him access to the courts by not permitting him to make multiple photocopies of his legal documents. *See id*. at Ex. H.   At the time of Plaintiff's Step I grievance, Defendant Bell was interviewed and cited MDOC Policy 05.03.116, which provides that:

> Prisoner[s] who lack sufficient funds to pay for copies of documents in their possession, or available to them in the law library, which are necessary for the prisoner to file with the court or serve on a party to a lawsuit shall be loaned funds to pay for the copying.  Funds shall not be loaned, however, for copying a document which can otherwise be reproduced by the prisoner.

*See id*.  The grievance was denied at Step I upon a finding that Plaintiff had been granted loans to copy legal exhibits on numerous occasions, and that if he were to "provide a court order requiring Library staff to make a certain number or amount of copies, the copies [would] be

---

[5] Even assuming that Plaintiff suffered an "infringement or inconvenience" because his outgoing mail was delayed during his time in segregation, here, he has not specified harm of a dimension that would implicate his constitutional rights.  *See Thomas*, 47 Fed. Appx. at 317.

made in accordance with the court's instructions." *Id*.  Attached as exhibits to the Complaint are two orders docketed in Plaintiff's civil suit in the Western District of Michigan.  *See* Compl. [1-2] at Ex. II, pp. 15-18 of 47.  The first order granted Plaintiff's motion to amend his complaint in that case, and the second order rejected his subsequently submitted filing. *Id*.  Neither order required that Plaintiff produce a certain number of copies, and Plaintiff's filings were not rejected for any reason concerning the number of copies he provided.  *See id*.

Again, Plaintiff has not demonstrated that he suffered an "actual injury" or legal prejudice because of any action by Defendant Bell.  *See Lewis*, 581 U.S. at 349-51.  Rather, he simply believes that "he should not have had to re-type the entire, previously filed complaint" in his civil action in the course of producing his amended complaint, particularly when his changes were minimal and affected only five pages of his thirty-page document.  *See* Pl.'s Resp. [27] at 17-18 & n.71.  Having to retype his complaint may have been an "infringement or inconvenience" to Plaintiff, but it does not constitute an "actual injury" of constitutional magnitude. *See Thomas*, 47 Fed. Appx. at 317.  Therefore, summary judgment in Defendants' favor is appropriate as to the issues raised in Grievance SRF-2009-06-769-28b.

### ii.        Retaliation/Denial of Indigent Postage: Grievance SRF-2010-01-7-15b

In Grievance SRF-2010-01-7-15b, Plaintiff claimed that on December 23, 2009, he attempted to mail five pieces of personal correspondence. *See* Defs.' Mot. S.J. at Ex. I.  Although he is permitted to send ten first-class envelopes per month without charge through MDOC's "indigent mail" program, his disbursement was returned to him a week later, without the letters. *See id*.  Indigent prisoners are allotted $4.40 per month in postage, to be used for both legal and personal correspondence; once the allotment is used, additional funds are loaned for legal mail, but not for personal mail.  *See id*.  At Step I, the Respondent, Defendant Blakeley, found that:

> Grievant sends out numerous amounts of legal mail packages. Funds for the legal mail are taken from the allotted $4.40 for postage when a prisoner is indigent. At the end of the month, there were no funds available for personal correspondence. Staff mailed out Grievant's mail in accordance with PD 04.02.120.

*Id*. Plaintiff appealed to Step II, contending that "after months of sending out both legal and personal mail he [was] now being told not to send out legal mail," and that this was done in retaliation. *Id*. The Step II Respondent found no merit to the grievance because Plaintiff had attempted to mail personal letters after he had exhausted his indigent postage funds for the month. *See id*. The Step II decision was upheld upon Plaintiff's appeal to Step III. *Id*.

Defendants seek summary judgment as to these issues, arguing that "[t]he Sixth Circuit has already determined that MDOC's policy limiting indigent/free postage to 10 letters a month does not violate the Constitution." *See* Defs.' Mot. S.J. [18] at 17-18 (citing *Bell-Bey v. Williams*, 87 F.3d 832, 838-39 (6th Cir. 1996)). In response, Plaintiff argues that in the past, "he and others had been allowed to 'slip through,' but [Blakeley] was now processing *his* [mail] per policy" in retaliation against Plaintiff after he filed this lawsuit. *See* Pl.'s Resp. [27] at 13, 17.

"It is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts [cognizable under 42 U.S.C. § 1983] if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Thaddeus-X*, 175 F.3d at 386. In the context of a prisoner's First Amendment right of access to the courts, a retaliation claim:

> essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

24

*Id.* at 394. It is difficult for a prisoner to establish the first element and show that his conduct was protected, "because prison regulations are allowed to infringe on prisoners' rights as long as they are rationally related to a legitimate penological concern." *Id.* (citing *Turner v. Safley*, 482 U.S. 78 (1987)). Thus, "if a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one." *Id.*

Here, it was determined at each stage of the administrative review process that MDOC staff processed Plaintiff's mail in accordance with PD 04.02.120, which establishes postage guidelines for indigent inmates. *See* Defs.' Mot. S.J. at Ex. I. As Defendants note, the Sixth Circuit has confirmed the validity of that MDOC policy. *See Bell-Bey v. Williams*, 87 F.3d at 838-39. Plaintiff, himself, acknowledges that Blakeley "process[ed] *his* [mail] per policy." *See* Pl.'s Resp. [27] at 13, 17. Plaintiff is incorrect in suggesting that it is "protected conduct" for him to demand treatment in violation of this "legitimate prison regulation"; he "cannot proceed beyond step one" of the three elements required to sustain a prima facie claim for retaliation. *See Thaddeus-X*, 175 F.3d at 394. Therefore, summary judgment should be granted in Defendants' favor with regard to the issues raised in Grievance SRF-2010-01-7-15b.

### iii.    Due Process/Security Classification: Grievance SRF-2009-06-769-28b

In Grievance SRF-2009-06-769-28b, Plaintiff complains that after his major misconduct hearing, he was placed in "Level IV" segregation on the basis of a security classification that was incorrect insofar as the calculation included points associated with a "threatening behavior" charge of which he was found not guilty. *See* Defs.' Mot. S.J. at Exs. O, P; *see also* Compl. [1] at ¶¶ 46-47. MDOC policy PD 05.01.130 states in part that:

> There is no right to placement at a particular security level, prisoners shall be classified according to management and confinements requirements necessary for the protection of the general public, prevention of escape, maintenance of control and order and safety of staff and prisoners.

Defs.' Mot. S.J. at Ex. O.  When his grievance was reviewed at Step I, Plaintiff was advised that his "placement in Level IV was not based on points but a security reason which [was] consistent with policy."  *Id*.  Plaintiff was rescreened using the correct "points," but he nevertheless remained designated as a Level IV.  *Id*.; Compl. [1-1] at p. 13 of 30.  At Step II, Plaintiff's appeal was denied upon a finding that there had been no violation of policy or procedure, and the finding was upheld at Step III.  Defs.' Mot. S.J. at Ex. O.  Defendants argue that "an inmate does not have a liberty interest in his placement in administrative segregation."  *Id.*  On the other hand, Plaintiff believes that he has "a policy-created liberty interest in NOT being arbitrarily placed in level IV based on inaccurate information."  *Id*. at Ex. O.

The State can create a liberty interest by including mandatory language in its internal regulations, thereby entitling prisoners to procedural protections before those liberties are revoked.  *See Sandin v. Conner*, 515 U.S. 472, 480, 487 (1995).  However, "[t]he Due Process Clause standing alone confers no liberty interest in freedom from state action taken 'within the sentence imposed.'"  *Id*. at 480.  "Apart from any mandatory language in a regulation, [a] plaintiff must also prove that he suffered restraint which imposed an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995) (quoting *Sandin*, 515 U.S. at 472-73).  The Sixth Circuit has held that "placement in administrative segregation [is] not an atypical and significant hardship . . . within the context of [a] life sentence."  *Id*. at 791.

Here, Defendants showed that the error related to Plaintiff's "threatening behavior" points had no impact on his security classification.  Plaintiff proffered no contrary evidence. Moreover, he provided no evidence that his security classification deprived him of a liberty interest created by mandatory language in the applicable MDOC policy.  *Cf. Rimmer-Bey*, 62

F.3d at 791.  To the contrary, the policy explicitly specifies that a prisoner has "no right to placement at a particular security level."  *See* Defs.' Mot. S.J. at Ex. O.  Like the plaintiff in *Rimmer-Bey*, Plaintiff is serving a life sentence in MDOC facilities, and his temporary "placement in administrative segregation" based on the "correctional experiences of the screener" did not constitute "an atypical and significant hardship . . . within the context of his life sentence."  *See id.*; *Rimmer-Bey*, 62 F.3d at 791.

### D.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO CLAIMS FOR WHICH NO GRIEVANCE WAS FILED OR EXHAUSTED

Defendants' motion does not directly address any of Plaintiffs' claims against Defendants Vittitow, Rapelje, Best, Buczek and Freed that are not reflected in the eleven Step III grievances discussed above.  Rather, Defendants simply argue that the absence of any grievances related to those claims must mean that Plaintiff failed to exhaust those claims.  Defs. S.J. Mot. [18] at ¶ 3. Certainly, Defendants are entitled to summary judgment on any such claims that ***were grievable***. *Id.*, Ex. C at ¶¶ B, V.  Such claims include those made against Defendants Vittitow, *see* Compl., ¶¶ 105-130 (handling of grievance responses), Warden Rapelje, ¶¶ 131-140 (same, and failure to respond to Plaintiff's requests), Best, ¶¶ 6-16 (failure to transfer Plaintiff and verbal insults), and Buczek, ¶¶ 81-91 (prison transfer process).  Plaintiff's response brief did not even address Defendants' failure to exhaust arguments as to those claims.

Plaintiff did, however, offer an explanation for not grieving Defendants Best and Freed for their alleged wrongful conduct with respect to the major misconduct charges and the related administrative hearing.  Compl. [1] at ¶¶ 17-28.  Citing *Bey v. Johnson*, 407 F3d 801, 804 (6th Cir. 2005) and *Smith v. Craven*, 61 Fed. Appx. 159, 162 (6th Cir. 2003), Plaintiff argued that issues involving "major misconduct" charges and "disciplinary matters" are "non-grievable" under the Policy.  However, Plaintiff's position overstates the law.  Paragraph F(2) of the

27

operative Policy (adopted years after both *Bey* and *Smith* were decided) provides: "Decisions made in hearings conducted by hearing officers of the State Office of Administrative Hearings and Rules…and issues ***directly related*** to the hearing process (e.g., sufficiency of witness statements; timeliness of misconduct review; timeliness of hearing)" are "non-grievable."  Defs.' Mot. S.J., Ex. C at ¶ (F)(2) (emphasis added).  In analyzing the provision recently, the Sixth Circuit made clear that while the ***process*** and ***outcomes*** of misconduct hearings are not grievable under the Policy, "the filing of retaliatory misconduct *reports* is grievable under [the Policy]." *Reynolds-Bey v. Harris-Spicer*, 428 Fed. Appx. 493, 501 (6th Cir. 2011) (emphasis in original). Accordingly, Plaintiff could have filed a grievance against Best for filing an alleged retaliatory misconduct report.  Because he failed to do so, Best is entitled to summary judgment.  *Id.*; Defs.' Mot. S.J., Ex. C at ¶¶ B, F(2), V.

Defendant Freed was Plaintiff's Hearing Investigator, whose role apparently was to investigate the charges against Plaintiff and to assist him with the hearing process.  Compl., ¶¶ 23-28.  Although the parties did not address the question of whether Freed's conduct was "directly related to the hearing process," and therefore grievable under the Policy, it arguably can be characterized in that manner.  *See Dorch v. Crittendon*, No. 09-13936, 2010 WL 5390175, at *4 (E.D. Mich. Dec. 22, 2010) (noting that the three parenthetical examples in Paragraph (F)(2) of the Policy "directly relate to the process of presenting a hearing designed to investigate and resolve relevant complaints.").  *See also Reece v. Rivard*, No. 11-11814, 2011 WL 5025487, at *5 (E.D. Mich. Sept. 16, 2011) (citing *Dorch*).  As such, the court cannot conclude that Plaintiff's failure to file a grievance against Freed gives rise to a failure to exhaust defense.

Nevertheless, Plaintiff's claims against Freed, which the court interprets as alleging a violation of his Due Process rights, Pl. Resp. at 22, are ripe for dismissal under either §

28

1915(e)(2) or § 1915A(b)(1), which require this court to *sua sponte* dismiss Plaintiff's complaint to the extent it fails to state a claim upon which relief can be granted. The court notes that Plaintiff's complaint does not allege, and Plaintiff provided no evidence, that Freed was part of the conspiracy referenced elsewhere in Plaintiff's complaint. More importantly, Plaintiff admits that he was found not guilty of the most serious charge he faced, and that as a result of his being found guilty of the lesser charges, he "was given the unusually lenient disposition of 10 days[6] of LOP [loss of privileges]" in segregation. Compl., ¶ 27. As discussed above, to state a claim for violation of Plaintiff's Due Process rights, he was required to allege and show "that he suffered restraint which imposed an 'atypical and significant hardship on [him] in relation to the ordinary incidents of prison life.'" *Rimmer-Bey*, 62 F.3d at 790-91. Plaintiff cannot satisfy that requirement here.

The law is clear that temporary "placement in administrative segregation [is] not an atypical and significant hardship . . . within the context of [a] life sentence." *Id*. at 791. Indeed, segregation sentences of greater duration than the one Plaintiff claims was wrongfully imposed on him have been found not to constitute "atypical and significant" deprivations. *See Sandin*, 515 U.S. at 486 (holding that 30 days "disciplinary segregation" "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest."); *Murray v. Unknown Evert*, 84 Fed. Appx. 553, 555 (6th Cir. 2003) (citing numerous cases where "confinement to administrative segregation does not present an 'atypical and significant' hardship implicating a protected liberty interest."); *Hall v. Fuqua*, No. 10-13350, 2010 WL 3768345 at *2 (E.D. Mich. Sept. 21, 2010) (30 days detention in segregation and loss of privileges were not "atypical and significant hardship[s]" on him) (quoting *Sandin*, 515 U.S. at

---

[6] Plaintiff claims he spent a total of 22 days in segregation, Compl., ¶ 41, but, for the reasons discussed below, the additional 12 days are immaterial to the court's analysis.

484).  Thus, Plaintiff's segregation and loss of privileges did not constitute a cognizable liberty interest protected by the Due Process Clause.  *Id.*  "Where the interest is not a protected one, there is no cognizable harm to the individual deprived of that interest."  *Id.* (citing *Orr v. Hawk*, 156 F.3d 651, 654 (6th Cir. 1998)).  Thus, Plaintiff's Due Process claims against Defendant Freed fail as a matter of law, and summary judgment should be granted in Freed's favor.

**IV.    THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS**

Defendants' summary judgment motion did not specifically address Plaintiff's state law claims.  However, in light of the court's recommendation to grant Defendants' Motion for Summary Judgment, the court recommends that the District Court decline to exercise supplemental jurisdiction over those state law claims, and dismiss them without prejudice.  28 U.S.C. §1367(c)(3); *see Brown v. Cassens Transport Co.*, 546 F.3d 347, 363 (6th Cir. 2008) (noting that federal court should typically decline to exercise pendent jurisdiction over a plaintiff's state-law claims after dismissing the federal claims); *Nali v. Angelo*, 2011 WL 824596, at *3 (E.D. Mich. Mar. 3, 2011).

**V.    CONCLUSION**

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment [21] be **GRANTED.  IT IS FURTHER RECOMMENDED** that all Defendants other than Defendant Beard be **DISMISSED** from this action with prejudice as to Plaintiff's federal claims, and without prejudice as to Plaintiff's state law claims.

Dated: March 5, 2012                          s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to file objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the undersigned Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may file a response within fourteen (14) days of its service with a copy of another party's objections.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). It is recommended that any such response be concise, but commensurate in detail with the objections, and that it address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on March 5, 2012, the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing.


<u>s/  Felicia M. Moses</u>
FELICIA M. MOSES
CASE MANAGER